IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-4399
Summary Calendar
_____

IN THE MATTER OF:    RODNEY DALE COSTON and
                     BILLIE KATHERINE COSTON, Debtors.

RODNEY DALE COSTON and
BILLIE KATHERINE COSTON,
                              Appellants,

            versus

BANK OF MALVERN,
                              Appellee.
_____

        Appeal from the United States District Court
            for the Eastern District of Texas
_____

                  (October 30, 1992)

Before KING, DAVIS, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

     In this bankruptcy case, Debtors-Appellants Rodney and Billie
Coston (the Costons) appeal two rulings of the bankruptcy
court))one procedural and the other substantive))and the
affirmations of those rulings by the district court, in favor of
Appellee, Bank of Malvern (the Bank).  The Costons ask us to
reverse the bankruptcy court's rulings that (1) the Bank timely
filed its motion for non-dischargeability of a loan, and (2) the
loan itself was not a dischargeable debt.  Concluding that the
bankruptcy court erred in its determination of non-dischargeability
of the debt, we reverse that court's decision and the subsequent

affirmance thereof by the district court.

I

FACTS AND PROCEDURAL HISTORY

Both of the Costons were employees of American Airlines. They resided part of the time in Malvern, Arkansas, where Rodney's family had been long-time residents, and the other part of the time in Athens, Texas. In Malvern, they purchased a pleasure-boat manufacturing operation, which became the Coston Corporation. In furtherance of that business, the Costons took out a series of loans from the Bank, the first of which))the one here at issue))was for $175,000.

To obtain the $175,000 loan (and others), the Costons were required to submit a joint financial statement to the bank. On that statement, Rodney represented that his account in his employer's retirement plan was worth $1.2 million (which it was) and was readily convertible into cash (which it was not). At several meetings with representatives of the Bank after filing the statement, Rodney reiterated those representations. The court found that the bank, in making the loan, relied on Rodney's representation that the retirement fund was readily convertible to cash.

By the late 1980s, the Costons had begun to experience business and financial problems. On January 25, 1989, the Bank and the Arkansas Development and Finance Authority (ADFA), another the Coston's Arkansas creditors, filed a petition in the bankruptcy

2

court for the Western District of Arkansas, forcing the Costons into involuntary bankruptcy. The next day the Costons filed a voluntary petition in the bankruptcy court for the Eastern District of Texas. Pursuant to bankruptcy rule 1014(b),[1] ADFA filed a notice of stay with the bankruptcy court in Texas, which notice informed that court of the requirement that it stay all proceedings involving the Costons. The court in Texas had already set March 1, 1989, as the date for the first meeting of creditors and was in the process of setting other deadlines when it was informed of the stay. Given the pre-existence of the Arkansas proceedings and the rule 1014(b) stay, the court in Texas cancelled the creditors' meeting and in essence put the bankruptcy proceedings in Texas on hold pending disposition by the court in Arkansas of a motion to determine proper venue.

On May 10, 1989, the bankruptcy court in Arkansas entered an order dismissing the involuntary petition, effectively resuscitating the Texas proceeding. The bankruptcy court in Texas then set the initial meeting of creditors for July 10, 1989. Within sixty days after this meeting, the Bank filed its "Complaint Objecting to Discharge" of the $175,000 note. At that point, and consistently thereafter, the Costons argued that the Bank's objection to discharge was untimely because it was not filed within sixty days following the March 1, 1989, meeting,[2] even though that meeting had been cancelled by the bankruptcy court in Texas under

---

[1] BANKR. R. 1014(b) (1988).

[2] See BANKR. R. 4004, 4007.

the Rule 1014(b) notice of stay from its counterpart in Arkansas.

The bankruptcy court in Texas rejected the Costons' argument because the Bank's motion had been filed within sixty days after the July 10, 1989, meeting. The court reasoned that the requirement to file within sixty days of the March 1, 1989, meeting had been nullified))not merely postponed and rescheduled))by the stay notice under rule 1014(b) filed in the bankruptcy court in Texas.[3] The court went on to hold that the $175,000 note was not dischargeable, explaining that the Costons had (1) submitted materially false information to the bank to procure the loan, and (2) the bank had _reasonably_ relied on that information in making the loan.

The Costons appealed the bankruptcy court's decision to the district court, asserting error in the bankruptcy court's rulings as to timeliness of the Bank's opposition to discharge and as to the dischargeability of the debt. The district court affirmed both rulings of the bankruptcy court after which the Costons timely appealed those issues to this court.

---

[3]One of the Costons' arguments is that the Arkansas proceeding was "facially invalid" because the Bank wrongly initiated a _joint_ involuntary petition. The Arkansas bankruptcy court later dismissed the proceedings and one of the grounds was the joint character of the petition. Nevertheless, the force of that court's Rule 1014 stay order, which the Texas bankruptcy court correctly recognized, cannot seriously be questioned by the Costons simply because the Arkansas case was later dismissed.

II

ANALYSIS

A.  Standard of Review

On appeal of a bankruptcy case, reviewing courts))district and courts of appeals alike))must accept the findings of fact of the bankruptcy court unless the findings are clearly erroneous.[4]  Also, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses."[5]  Circuit courts are guided by the rule that "[s]trict application of the clearly erroneous rule is particularly important whe[n] the district court has affirmed the bankruptcy court's findings."[6]  Matters of law, however, are reviewed de novo.[7]

B.  Timeliness of the Bank's Motion

Procedurally, the Costons argue that the Bank's failure to file its objection to discharge of the $175,000 note within sixty days of the March 1, 1989, scheduled date for the first meeting of creditors makes that motion untimely.  We join the bankruptcy and district courts in disagreeing with this assertion.  The Costons rely on the strictness of bankruptcy Rule 4007(c), which commands

---

[4]Wilson v. Huffman (In re Missionary Baptist Found. of America), 818 F.2d 1135, 1142 (5th Cir. 1987); see In re Niland, 825 F.2d 801, 805 (5th cir. 1987).

[5]BANKR. R. 8013.

[6]Missionary Baptist Found., 818 F.2d at 1142.

[7]See Matter of Monning's Dept. Stores, Inc., 929 F.2d 197, 200-01 (5th Cir. 1991).

5

that "[a] complaint to determine the dischargeability of any debt pursuant to § 523(c) of the Code shall be filed no later than 60 days following the <u>first date set</u> for the meeting of the creditors."[8]  The Costons cite no less than twenty-five cases to this court to inform us of the meaning and rigidity of that phrase. But not one of those cases))or for that matter any of the cases cited to the district court))deal with a situation involving a stay under Rule 1014(b).

> Rule 1014(b) mandates:
>
> If petitions commencing cases under the Code are filed in different districts by or against (1) the same debtor, or (2) a partnership and one or more of its general partners, or (3) two or more general partners, or (4) a debtor and an affiliate, on motion filed in the district in which the petition filed first is pending and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, the court may determine, in the interest of justice or for the convenience of the parties, the district or districts in which the case or cases should proceed.  Except as otherwise ordered by the court in the district in which the petition filed first is pending, the proceedings on the other petition <u>shall</u> be stayed by the courts in which they had been filed until the determination is made.[9]

In reliance on this rule, the Bank insists, and we agree, that it did not have to file its motion in the Texas bankruptcy court until the Arkansas case was terminated and the Rule 1014(b) stay was lifted.  The instant situation is precisely what is comprehended in Rule 1014(b).  Once the notice of stay was recognized by the court in Texas, that court's proceeding was on hold indefinitely until the stay was lifted and the proceeding in Arkansas dismissed.  Only

---

[8]BANKR. R. 4007(c)(emphasis added).

[9]BANKR. R. 1014(b)(emphasis added).

when that occurred and a date was set for the initial meeting of creditors did the sixty days begin to run. In the stay situation, the new date set by the court is the "first date" under Rule 4007(c); it is not merely a rescheduling of the old pre-stay date.

Facially, this ruling may appear to contradict the wording of Rule 4007(c). But, in light of Rule 1014(b), no other result is sensible or possible. The Bank cannot be penalized because it did not comply with a filing deadline of a court whose proceedings had been stayed. To suggest that even though the court's proceedings on the Costons' case had been stayed under Rule 1014(b), its filing deadline under Rule 4007(c) continued to run is ludicrous. We reject this procedural contention by the Costons.

## C. Non-Dischargeability of the $175,000 Note

Substantively, the Costons argue that they were wrongfully denied discharge of the $175,000 note under § 523 of the bankruptcy code. The bankruptcy court properly noted that there are four elements needed to deny a discharge: (1) a statement in writing that is materially false; (2) that concerned the debtor's financial condition; (3) the creditor's reasonable reliance on that statement; and (4) the debtor's intent to deceive when the statement was published.[10]

It is clear from the record, as the bankruptcy court found, that the statement was (1) in writing, (2) materially false (the asset had been improperly placed in the liquid assets column of the

---

[10]See 11 U.S.C. §523 (a)(2)(B).

form), (3) concerned with the debtor's financial condition, and (4) made by the debtor with the intent to deceive.[11]  Like the district court before us, however, we have a problem with the question of the reasonableness of the Bank's reliance on the Coston's statement that the $1.2 million retirement fund was readily convertible to cash.  We readily acknowledge that this case presents a close call as to whether the reliance of the bank was reasonable.  If we were constrained by the clear error standard on this issue (as the Costons wrongly assert we are))albeit such an assertion is against their interest), there is no doubt that we would have to affirm. We are not, however.  Although reliance is an issue of fact, reasonableness is an issue of law; and we conclude here that in view of all of the Bank's activities in connection with this matter, its reliance on the statement without seeking verification simply was not commercially reasonable.  We take additional comfort in the knowledge that public policy favors discharge.[12]

    We review de novo the determination of objective reasonableness of the bank's reliance.  In In re Jordan, we stated that "[t]he reasonableness of reliance [under § 523] is a

---

[11]The bankruptcy court stated:  "I do not find Mr. Coston's testimony about his lack of knowledge about his retirement account credible. . . .  I believe that he listed the retirement account in this specific location . . . to make it look much better than it was . . . ."  We are bound by this finding.  See BANKR. R. 8013.

[12]See Perez v. Campbell, 402 U.S. 637, 648 (1971)(discussing the overarching desire to grant a "fresh start" in bankruptcy).

conclusion of law, which we review accordingly."[13]  It is clear that in matters relating to questioning the applicability of the discharge, all parts of an exception must be construed in view of the strong presumption in favor of granting discharge.[14]

The district court relied on several factors in concluding that the bankruptcy court had not erred in finding the Bank's reliance reasonable.  These included:  (1) the Bank was small and relatively unsophisticated; (2) the board members were personally familiar with Rodney's family (we note that although the district court stated that the officers of the Bank knew Rodney and had participated in other loans with him, the bankruptcy court had found that "it is clear that Rodney was not a regular customer of the bank"); (3) the Bank had done business with the person from whom the Costons were buying the business; (4) the president of the Bank personally met with Rodney and discussed all aspects of the financial statement; and (5) it was not obvious from the listing of retirement benefits in the Costons' financial statement that further investigation might be required to ascertain whether such benefits were readily convertible to cash.

---

[13]927 F.2d 221, 225 (5th Cir. 1991)(citing In re Bonnet, 73 B.R. 715, 721 (C.D. Ill. 1987), and In re Martz, 88 B.R. 663 (Bankr. E.D. Pa. 1988)).

[14]See Perez, 402 U.S. at 648; In re Foreman, 906 F.2d 123, 127-28 (5th Cir. 1990)(stating that "'[i]n determining whether a particular debt falls within one of the exceptions to section 523, the statute should be strictly construed against the objecting creditor and liberally construed in favor of the debtor'" (quoting 3 COLLIER ON BANKRUPTCY ¶ 523.05A)); see also In re Jacox, 115 B.R. 218, 221 (Bankr. D. Neb. 1988)(stating that courts must look with a critical eye at creditor's proof of objective reasonableness of claimed reliance).

The district court concluded by quoting the In re Jordan opinion and stating that although the Bank's practices might not have been the most prudent, they were not unreasonable. Albeit without great enthusiasm, we reach the opposite legal conclusion. Given the closeness of the decision, we are ultimately swayed by the strong presumption favoring discharge.[15]

In In re Jordan, we determined that a bank had reasonably relied on financial data submitted to it by the debtor, and we affirmed the refusal of discharge on that and other grounds. The essence of the In re Jordan decision, however, was that there were no "red flags" that should have alerted the bank to the need to investigate the information submitted to it.

The In re Jordan court contrasted the facts of that case with the facts of In re Mullet,[16] in which reliance on the unverified statements of the debtor was found not to be reasonable. The Mullet case involved a young, unproven bank customer and "'there were inconsistencies in his representations, [and] minimal investigation and verification would have uncovered the falsity of the representations.'"[17] In In re Jordan, as in the instant case, there were no inconsistencies in the information submitted. Unlike In re Jordan, however, the Costons' main asset (an allegedly liquid retirement fund) was obviously suspicious. The instant case does not contain the same overt flags as the Mullet case))i.e., glaring

---

[15]See In re Foreman, 906 F.2d at 127-28.

[16]817 F.2d 677 (10th Cir. 1987).

[17]Jordan, 927 F.2d at 226 (quoting Mullet, 817 F.2d at 681).

10

inconsistencies in the submitted forms))yet it does contain a significant factor that should have been))and shortly thereafter became))a red flag: whether the retirement fund was truly a liquid asset.

As the Bank belatedly learned, one simple procedure))a single phone call to American Airlines))would have provided all of the uncomplicated and unequivocal information needed to determine that in fact the asset was _not_ liquid. We are not so much convinced by _our_ view of what a prudent banker would do to verify a financial statement as much as we are convinced by what the Bank did on the occasion of subsequent advances it made to the Costons. On the event of the second loan, the bank found a need to verify the liquidity of the asset. We do not understand how reasonable practice on the second loan requires verification and yet reasonable practice on the first loan, when the liquidity was not verified, allows non-verification.

The bankruptcy court held that, as the Bank knew about the illiquidity when it made the second and subsequent loans, its reliance on the financial statement was unreasonable and the loans were not excepted from discharge. We fail to see how, as a matter of law, such a minor bit of diligence))calling American Airlines)) could become a reasonable procedure between the first and second loans. When a significant liquid asset is an employee's account in a pension plan and the employee is obviously under retirement age, even a small town banker personally familiar with all the players knows or should know to "cut the cards." A reasonable banker

11

simply would not rely so extensively on the liquidity of such an asset without verification.

We hold that the Bank was not reasonable in thus relying on the listing of Rodney's account in the retirement fund as the main source of the borrower's liquidity. This was demonstrated by the Bank's own subsequent act of verifying liquidity))actually, the lack of liquidity))in connection with the second loan. We therefore conclude as a matter of law that the $175,000 loan was subject to discharge and that the bankruptcy court erred in excepting it under § 523.


III

CONCLUSION

The bankruptcy and district courts admittedly made close calls concerning the reasonableness of the Bank's reliance on the liquidity of the retirement plan account. Although we too acknowledge that the issue is a close one, we conclude that, in view of the Bank's subsequent behavior and the suspicious nature of the asserted liquidity of the asset, reliance on the borrowers' statement without so much as making a single telephone call to verify liquidity simply was not reasonable. Therefore, although we agree with the bankruptcy and district courts that the Bank's motion for denial of discharge was timely, we determine that the question of discharge was wrongly decided and we thus reverse the decision of the bankruptcy and district courts on that issue and render a judgment discharging the Costons' remaining debt to the

12

Bank.

REVERSED and RENDERED.